

# In the
# Missouri Court of Appeals
# Western District

**IN THE INTEREST OF: C.R.B.,**
                **Appellant,**

                             **WD85433**
                         **OPINION FILED:**
                         **July 18, 2023**

**v.**

**JUVENILE OFFICER,**
                **Respondent.**

**Appeal from the Circuit Court of Johnson County, Missouri**
The Honorable Brent F. Teichman, Judge

Before Division Four:  Gary D. Witt, Chief Judge, Presiding, Lisa White Hardwick, Judge, Jalilah Otto, Special Judge

C.R.B. appeals from an order of the Circuit Court of Johnson County, Missouri, dismissing his juvenile proceedings and transferring him to a court of general jurisdiction and certifying him to be criminally prosecuted as an adult pursuant to section 211.071.[1] The order disposed of all claims and issues and, therefore, it is a final, appealable judgment.

---

[1] All statutory references are to the Revised Statutes of Missouri (2016), as currently updated by supplement unless otherwise indicated.

*In the Interest of J.N.W. v. Juvenile Officer*, 643 S.W.3d 618, 628 (Mo. App. W.D. 2022). On appeal, C.R.B. claims that his counsel was ineffective in failing to have C.R.B. evaluated for his competence to proceed at the certification hearing considering C.R.B.'s substantial history of disability and mental illness, and there was a reasonable probability that C.R.B. was incompetent to be certified. We affirm the judgment of the Circuit Court.

**Factual and Procedural Background**

C.R.B. was born on April 29, 2004. On April 18, 2022, eleven days before his eighteenth birthday, Respondent Juvenile Officer ("JO") filed a petition alleging that the previous day, C.R.B. committed what would be, if he were an adult, Murder in the Second Degree, section 565.021, and Armed Criminal Action, section 571.015. That same day, the Circuit Court appointed counsel for C.R.B. ("Counsel"). Three days later, the JO filed a motion to dismiss the juvenile cause of action and certify C.R.B. to be prosecuted under the general laws as required by section 211.071.1.

On May 17, 2022, the court held a certification hearing. A single witness testified at the hearing, Deputy Juvenile Officer Kevin Ambrose ("Ambrose"). C.R.B. did not introduce any evidence.

Ambrose testified, pursuant to the statutory factors set forth in section 211.071.6, that the murder was a serious offense, that the alleged offenses were a danger to the community, and that the allegations involved viciousness, force, and violence. The offenses were against a person and not just to property, and, considering that C.R.B. "has

a prior conviction for murder in the second degree,"[2] was part of a repetitive pattern of offenses by C.R.B. Ambrose testified that there were other juvenile referrals for C.R.B.; he had been charged with domestic assault, tampering with a motor vehicle, first-degree assault, second- and fourth-degree assault, and property damage, which resulted in C.R.B. being placed in secure detention. While in detention by the Division of Youth Services ("DYS"), C.R.B. tested positive for marijuana and methamphetamine. Ambrose testified that there were not facilities, treatment programs, or services through the juvenile system that could benefit C.R.B. that were available to the court. Because C.R.B. had previously been committed to DYS, any services that were available to C.R.B. would have been presented to him at that time; Ambrose did not believe C.R.B. was a proper person to be dealt with under the juvenile code.

While C.R.B. had been committed to the DYS in 2021, the court had ordered that C.R.B. "undergo a psychiatric evaluation." Ambrose's written report to the court in this case set forth the findings regarding C.R.B.'s mental health status as follows:

> Information suggests [C.R.B.'s] intelligence, maturity, and sophistication are below average for his age. The most recent IQ testing on April 30, 2019, resulted in a score of sixty-six, indicating he is of extremely low intelligence and scholastic aptitude. [C.R.B.] obtained his Missouri High School Diploma on April 14, 2021. [C.R.B.] has a significant history of aggressive and violent behaviors resulting in hospitalizations, contact with law enforcement, and mental health treatment. [C.R.B.] has had no less than ten acute hospitalizations related to physical aggression, anger, self-harm, suicidal ideation, and homicidal ideation. Previous diagnos[es] include Oppositional Defiance Disorder, Post Traumatic Stress Disorder, Intermittent Explosive Disorder, and Disruptive Mood Dysregulation Disorder. Outpatient services upon discharges [were] inconsistent.

---

[2] C.R.B. was charged as a juvenile with what would have been Murder in the First Degree if committed by an adult in July of 2019. The charge was amended to Murder in the Second Degree, and it resulted in C.R.B.'s commitment to the Division of Youth Services in August of 2019.

3

In addition to having obtained his high school diploma during his commitment with DYS, the report stated that C.R.B. had also been enrolled at Moberly Community College and had been working to obtain an Occupational Safety and Health Administration Certification Card. C.R.B. had demonstrated a "high level of sophistication and maturity in the commission of the unlawful acts."

Although Counsel for C.R.B. did not introduce any evidence, he cross-examined Ambrose and made several objections to both Ambrose's testimony and his written report, on the bases of hearsay and lack of foundation. Counsel also argued for C.R.B. and against his certification at closing.

At the close of evidence, the court found that C.R.B. was "not a proper subject to be dealt with under the provisions of the juvenile code." The court's written order addressed the section 211.071.6 factors, making findings of fact and concluding that C.R.B. had "already had the benefit" of juvenile court services including the treatment and services of DYS and that there were "no programs, facilities, or treatment available to the Juvenile Court which could provide additional benefit" to C.R.B. and that the "protection of the community requires transfer of a court to general jurisdiction." This appeal follows.

## Standard of Review

Respondent JO acknowledges that juveniles' claims of ineffective assistance of counsel can be addressed on direct appeal. *See, e.g., In the Interest of J.N.W.*, 643 S.W.3d 618. If the record is sufficient to allow proper review of the claim of ineffective assistance of counsel, the issue can be addressed on direct appeal. *In the Interest of D.C.M. v.*

4

*Pemiscot C'nty Juvenile Office*, 578 S.W.3d 776, 782 (Mo. banc 2019). However, if the record is not sufficiently developed to allow for proper review of the issue raised the cause may need to be remanded to develop the factual basis for review of the claim. *Id.* at 783.

Because C.R.B. did not claim at the hearing below that his Counsel was ineffective, the JO argues that this issue was not preserved for review and can only therefore be reviewed for plain error. While the JO does cite juvenile cases for the proposition that an unpreserved claim can only be reviewed for plain error, the JO does not cite to any authority where the "unpreserved" issue is counsel's ineffectiveness, and counsel for a party could not realistically be expected to raise a claim of his or her own ineffectiveness in the lower court. No Missouri juvenile case has adopted a plain error standard of review when a claim of ineffective assistance of counsel is raised on direct appeal. Rather, this Court is the first court to examine C.R.B.'s Counsel's effectiveness and consistent with the procedures adopted by our Supreme Court in *D.C.M.* we will review the claim as if preserved.

**Analysis**

Certification hearings occur in what we refer to as the "Juvenile Court," even though it is actually a division of the Circuit Court. As such, they "do not have to conform with all of the requirements of a criminal trial or even of the usual administrative hearing as long as they measure up to the essentials of due process and fair treatment." *Id.* at 634 (internal quotation omitted). So long as the juvenile receives a hearing, access to counsel, and access to his or her records, and so long as the juvenile court's decision adequately sets forth the grounds for its decision to certify such that we can review it adequately, the process is sufficient constitutionally. *Id.* "Th[e] right to counsel implies that counsel must

5

be effective." *In the Interest of D.C.M.*, 578 S.W.3d at 782 (citing *In re Gault*, 387 U.S. 1, 30 (1967)).

Missouri courts have not yet decided whether claims of ineffective assistance of counsel at certification hearings are determined by applying the "meaningful hearing" standard or the *Strickland* standard. *See id*. at 784 n.11; *In the Interest of P.J.T.*, 643 S.W.3d 527, 533 (Mo. App. S.D. 2021); *In the Interest of J.N.W.*, 643 S.W.3d at 635. As in the other cases, the result we reach would be the same in this case under either standard.

The "meaningful hearing" standard, used in other civil matters such as termination of parental rights cases, examines "whether the attorney was effective in providing his client with a meaningful hearing based on the record." *In re W.J.S.M.*, 231 S.W.3d 278, 283-84 (Mo. App. E.D. 2007). In this case, Counsel cross-examined the only witness, objected to testimony and to the written report on the bases of hearsay and lack of foundation, and argued to the juvenile court in closing that C.R.B. would be better served remaining in the juvenile system. We conclude that this provided C.R.B. with a meaningful hearing.

Even under the more stringent and more familiar *Strickland* standard, however, we find that Counsel was not constitutionally ineffective. The *Strickland* standard, used to determine whether Counsel was ineffective in criminal cases, requires a demonstration, by a preponderance of the evidence that: (1) counsel failed to exercise the level of skill and diligence that a reasonably competent attorney would have under similar circumstances, and (2) the client suffered prejudice as a result. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). If the client, in this case, the juvenile, C.R.B., fails to show prejudice, we

6

need not address counsel's performance. *See Jindra v. State*, 580 S.W.3d 635, 641 (Mo. App. W.D. 2019) ("If either the performance prong or the prejudice prong is not met, then the court need not consider the other, and the movant's claim must fail."). In certification cases, prejudice amounts to "a reasonable probability that he would not have been certified to be prosecuted as an adult but for counsel's ineffectiveness." *In the Interest of P.J.T.*, 643 S.W.3d at 534 (Internal quotation and alterations omitted).

There is no reasonable probability that C.R.B. would not have been certified had Counsel requested an evaluation for C.R.B.'s competence. C.R.B. had allegedly committed his second murder just eleven days before his eighteenth birthday. The treatment and services he received in DYS detention after the first murder were unsuccessful in rehabilitating him or changing his behavior. Ambrose testified that there were no facilities, treatment programs, or services that could benefit C.R.B. that were available to the court.

The only factor even arguably weighing in favor of not certifying C.R.B. would have been his mental state. However, low IQ and mental illness alone are insufficient to render a criminal defendant incompetent to stand trial. "The suspicion or actual presence of some degree of mental illness or need for psychiatric treatment does not equate with incompetency to stand trial." *Hubbard v. State*, 31 S.W.3d 25, 34 (Mo. App. W.D. 2000) (internal quotation omitted). "In fact, an accused may [have an intellectual disability] in some degree and still be competent to stand trial or enter a knowing, intelligent plea of guilty." *Id.* "The test of competency is whether the accused has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, and whether he has a rational as well as a factual understanding of the proceedings against him." *Id.*

7

(internal quotations omitted). Although C.R.B. had a very low IQ, he was able to complete his high school diploma and was enrolled at a community college while he was in DYS detention. The written report admitted into evidence at the certification hearing found that C.R.B. had demonstrated "a high level of sophistication and maturity in the commission of the unlawful acts."

Moreover, Counsel and the juvenile court had an opportunity to observe C.R.B. at the hearing, and neither expressed any doubt about C.R.B.'s competence to participate in the certification hearing. "While a [juvenile's] demeanor may not be dispositive of his or her competency to stand trial, . . . the court is certainly free to consider demeanor when determining competency and give it the weight it determines is warranted." *Id.* at 36. C.R.B.'s low IQ was presumably unchanged from his previous dealings in the juvenile court, and, while his mental state had previously been questioned, after a psychiatric evaluation he was allowed to participate in court proceedings. C.R.B. has failed to establish that he is in fact not competent to proceed and therefore has failed to establish that his counsel was ineffective in failing to challenge his competency.

Further, if C.R.B. had been found incompetent to participate in the certification hearing, the remedy would be to stay proceedings until C.R.B. could be made competent and then proceed with the certification hearing, not to skip the certification process altogether. If C.R.B. is in fact incompetent, he may still challenge his competence to stand trial in the criminal courts with their full protections unavailable in the juvenile setting. C.R.B. has failed to set forth any argument that a declaration of incompetence at the certification stage of these proceedings would have any significant positive impact on him

8

as opposed to the potential subsequent finding of incompetence in the subsequent criminal proceeding. He still retains every opportunity to attempt to establish that he is incompetent to proceed in the criminal courts following his certification.

We conclude that C.R.B. has not established prejudice, and, therefore, his certification counsel was not ineffective such that his certification should be overturned.

## Conclusion

For all of the above-stated reasons, we affirm the judgment of the Circuit Court.

_____
Gary D. Witt, Judge

All concur

9